The next case of United States v. Lava Bit, LLC. Mr. Samuel, when you're ready, we'll hear from you. Thank you, Judge Neumeier, and may it please the Court. The company in this case offered the United States all of the information that the United States was seeking, all of it. And it did it in a way that would have protected the privacy of hundreds of thousands of innocent people, as well as... In the outset, I hate to jump in so quickly, but the order asked for unencrypted data. Yes. And on a real-time basis. And what was offered was a summary prepared by your client, either at the end of 60 days or sooner if they paid for it. The question is, could the company have provided unencrypted data on a real-time basis, technologically? So the offer and the negotiations with the government, I do agree that that became a sticking point, didn't really reach that stage. There's no technical reason that the record reveals, or of which I'm aware, that if the government had said, okay, we'll agree to this, but it really can't just be at the end of 60 days, real-time. I think that that would be a very different... And if the company couldn't have done that, I agree that that would have placed us in a very different position. But there's nothing about the company's offer that said... The offer was basically, I will record this data, I have a tool that can transmit it to your servers, I can do that either at the end of the period or I can set it up so it's more frequent than that. That isn't what they were ordered to provide. They were ordered to install a pen register and a tracking device which provided unencrypted data. Yes, and as the government notes in its brief, generally when it gets these kinds of orders, when it goes to other e-mail service providers, for example, and the e-mail service providers say, well, we'd be happy to implement this for you, we don't want to turn over our secret encryption keys, the government is typically fine with that. And so if the government had said, you need to do it on the same terms that Google or Facebook or anybody else does it, then, you know, what would have happened then, we don't know. What was the response that your client made to the first order, that is a June 28 order? Well, his first response in which sense, I guess I would say. His response was that his reading of the order, he was uncounseled at that point, was that it didn't require the turnover of these keys. And Judge Hilton at the hearing... Fair enough. I just want to know what he responded. His initial response, to be totally frank with you, was one of seeking clarity. He was not counseled, he wanted to know what the FBI was asking for and what the authority was for it. And, you know, his initial concern was, am I going to have to modify... Is that what he, what did he produce when he produced all the pages, seven or eight pages of gibberish, basically? That was the, you mean in response to the court's final order. Is that what it was? I was trying to get the factual sequence. Right. The encryption keys in the paper format, which look, of course, you know... Well, that's the encryption key. Right. That's the encryption key. Let me go back to my original question then. Sure. Is what was his response to the order to produce unencrypted data? Sure. I think that there's actually a very good colloquy between him and Judge Hilton on, I believe it's page, I think it starts around page 39 of the appendix, where there's this exact conversation. He says, all I've ever been objecting to is, you want to install the pen register? That is fine. I just don't want to provide the secret encryption keys. That was his response at the beginning. That was sort of the position. Once he was clear on what the government was asking, because there were a lot of oral demands that were not reduced to written orders and things like that, but by the time it was clear what the government wanted, what he represented to Judge Hilton was exactly right, that he had never objected to the installation of the pen register, just the provision of the encryption key. Of course, the problem is that that would produce data that the government couldn't read. Agreed. And so he made a further offer. That doesn't go. Okay. Go ahead. Once it became clear again, when orders had actually been issued and it was more clear what the government was asking, he said, I've got a compromise offer. I can record all of the data that you are seeking. I can modify my systems. And this would require him to modify his systems, but he offered to do that, to log the relevant data and turn it over to the government. I understand, but the government didn't want a middleman in there. They wanted direct evidence of the metadata as it was being generated. And it seems to me that they do not need to have your client in between. Now the question is, at that point, when the government says, we want real-time, unencrypted data, what's your client's response? Well, if the government had said, you've got a deal if it's real-time, and we're speculating about what the response would be, but I'm not aware of any technical reason that couldn't be done. And as the government says, that's the usual way. Well, why isn't that offered? Why wasn't that offered? The encryption key comes in only after your client is refusing to give them the unencrypted data. They don't want the key as an object. They want this data with respect to a target that they're investigating. And it seems to me that that's all this case is about. And it's been blown out of proportion by all these contentions that the government is seeking keys to access other people's data and so forth. And they're seeking unencrypted data with respect to targets. So the record actually reveals, I think, that that is not the case, because the offer was made before the July 16th hearing. I believe the offer was made, and it's at page 83 of the appendix. Tell us what the offer was. The offer was, and it might just be helpful to read it directly so that we don't have to rely on my characterizations. It is on page 83 of the joint appendix, and it's reproduced at several points in the briefs as well. Look at page 83 of the joint appendix. What was said. So this is the e-mail, and it states in relevant part, in light of the conference call, and this is where the government's request had been made clear and he was understanding what was being requested, it would be possible to capture the requested data ourselves and provide it to the FBI. He then lists specifically the data that could be requested. I understand, but you have to go along with the notion. The FBI doesn't want an intermediary. Sometimes, as the government notes, they are perfectly comfortable with an intermediary. They may be, but they weren't. I agree that they certainly weren't in this case. Okay, and they're entitled to get this data, or at least they were ordered, your client was ordered to produce this data, and it says to provide the FBI with an unencrypted data pursuant to the order. To the extent any information, facilities, or technical assistance are under the control of LavaBit or needed to provide the FBI with an unencrypted data, LavaBit shall provide such information, facilities, or technical assistance forthwith. Now, those are quotations actually from the statute, but quite apart from it, the court was clearly interested in having your client provide unencrypted data. Yes. The rub comes that there was never an offer, and I don't know if this is really where my question's headed, whether there was ever an offer to have the data unencrypted before it entered the PIN, the PIN register. I think that I'm not sure. I agree with you that that specific variant of the offer was never discussed, although what I will note is that the government didn't come back and say, you know, where they replied the same day. They didn't even sleep on it. They said, no, we're not interested in having you do what just about everyone else does. If they had come back and said, okay, you need to do it... It's not what everybody else does. That's not the standard. The standard is whether the government is entitled to keep an intermediary out, and the answer is yes. Well... And so now the question is, what did your client do at that point? Well, after the offer was refused, he then said to the district court, I don't think that the PIN register statute mandates this kind of assistance, and we then argued in the district court that the warrant was invalid. So, now, the government, even if, by hypothesis, if you're, you know, I don't want to resist, you know, I understand where you're coming from. The government is not only having to just trust the targets of its investigation. It's interesting that the PIN register order didn't authorize this. Where on the record did you say that to the district court? Well, the hearing began... I think the relevant portion of the hearing with Judge Hilton is at pages... I think it's 39 to 43 of the joint appendix. All right. And, again... Tell us the page where you said there was an authority under the PIN register statute to do it. Sure. So... And I would note, at the outset, that was also, if you look at the, you know, the transcript before Judge Hilton that we were about to parse, that is also Judge Hilton's understanding of the order, as well. The reason he said, we're not going to talk about SSL keys today. All the order requires is that the PIN register be installed. And so it's not just our characterization of the record. Look, that argument gets off. There is such a willingness and a desire to argue about secret keys being provided, and that's what's being taken, and the government's going to take full advantage of that and spy on everybody. What was ordered here was, with respect to a particular target, to provide unencrypted data pursuant to that order. Now, unencrypted is important, because that was the whole offer with respect to LavaBits services. And so the question is, how to get a PIN register recording unencrypted data. Right. And, now, the question is whether the order provided it. It says it clearly, right on its face. The question then is, did they violate the order and not produce it? Well, the question, as we understand it, is whether that order went beyond the kind of assistance that the PIN register statute allows the government to get automatically. Did you ever challenge that order? I don't see that. Well, here's why. As the portion of the transcript which we were just referring to. Here's why you didn't challenge the order? Here is why there were not more proceedings in district court about the PIN register statute. We're not talking about the statute. We're talking about a particularized order. And the order tells you clearly what to do. And the question is, did you ever challenge that order as a legal order? So, yes. If you go to the page, again, it is the page range identified before the transcript of the hearing before Judge Hilton. Mr. Levison is proceeding pro se. He has no counsel at this point. He's tried to get counsel, but things are happening very fast. Okay? He says to the district court that he wants to, quote, request a couple of things by motion. First thing isn't relevant here. The second thing he says is I... Now, what page are you on? So, if you look at page... It starts at page, you know, 43. This is when, you know, the government is addressing the court. And then Mr. Levison comes in and, you know, he begins and it's really just the next two pages where this transcript is where he presents his objections. He says, you know, I don't know if I'm wording this correctly. I'm not a lawyer. But I am... I've never objected to providing government installation of the pen register. I just don't think I should have to object to the keys. Now, what does the government say in response to this? They say, well, to avoid litigating this issue... Well, he never... You haven't showed us anywhere where either he or counsel ever said there is an authority under the pen trap statute or the stored communications statute to issue these order or the warrant. That... And there is a good reason for that, which is when he came in uncounseled to district court and said, I think that I won't object to providing the private keys under the pen register order that I've got here. What the government came back and said... There was no order originally to provide keys. Well, right. There was never an order to provide keys until later on when he resisted and the only way the government could get it is to get the key. And even then, the government was authorized to use the key only with respect to a particular target. So I agree that... And that was actually the point that he made to the district court, which is that this order doesn't on its face require me to produce these keys. And what the government said next is really very important, which is they said, to avoid litigating this issue, we have gotten this other warrant. They told the district court, you don't need to decide any of this pen register stuff because we've got this warrant now and that's what the case is about. So it's true that the next hearing, 10 days later,  Now he did have counsel. The parties focused on the validity of the warrant. But that's because that's what the government invited everyone to do. And so, now the government comes in and says, well, it was waived because it was never presented. Is there anywhere on the record where the authority under the warrant, under the Store Communications Act, was challenged? The warrant, if you look at pages, I believe this is the motion that after that first hearing before Judge Hilton... Why don't you give us a page? Sure. It is... Pages... The motion begins at page, I think it's 66, right? This is the motion to quash the subpoena and the search warrant and it addresses the search warrant specifically on two bases. It says it's constitutionally invalid and it also exceeds what the statute authorizes. Now, I will be candid with you. The precise arguments that we have pressed here with regard to that have evolved, obviously, as we have had time to sort of think about these things and address them. What page do you say in the record that you told the district court that there was no authority under the Store Communications Act for the warrant? So, beginning on page 70... On an exact page where you told the district court that. Yeah. Beginning on page 70 of the joint appendix, heading B is an objection to the subpoena and the warrant that are on statutory grounds. Now, it goes on... I guess it's... Yeah, it's page... And then it starts on 71 also. It talks about the undue burden standard that we press here and the statutory standard cut out. That goes to access to other users' accounts. It does. Well, it in part goes to that. It also goes to the undue burden point that we have pressed here. Now, I agree with... It's an objection. Right. It's an objection. Right. It is an objection on statutory grounds and an objection on constitutional grounds. Now, the usual rule is that parties aren't limited to the precise claims they press below. But even if, by hypothesis, this court were to conclude that those arguments should be deemed waived, which obviously we don't think they are, but if the court concluded that, there are a lot of good reasons to entertain the arguments nonetheless here anyway. As the government candidly concedes, Mr. Levison was, quote, intermittently represented by counsel below. These proceedings were happening extraordinarily quickly, due both to the nature of the court below and the nature of the litigation. And there are, you know, obviously questions of enormous importance both to the government and not just this litigant, but to other service providers in the United States. What about the order of August 1st where the district court specifically relies on the pen register order? And it's a written order. It is a written order. And when the government sought sanctions in violation of that order, there were ex parte proceedings at which we were never able to participate. And so we may have been able to object on those grounds and say, well, we're hearing about the pen register order again all of a sudden. You didn't get the order of August 1st? We got the order of August 1st. And we, at that point, produced the keys in paper format and the government went in and got sanctions. And so all I'm noting is that the Pen Register Act, if you sort of look at the operative portions of the transcript of that later hearing on the motion to quash, there's really not a discussion of the Pen Register Act. And there's a good reason for that because the government had said to everybody, let's focus on the warrant to, quote, avoid litigating that issue. Well, that's fair enough. And that's where the government wanted to press the matter. But the government also had an order under the Pen Register Act, the facilitating statute, and the district court made clear what it wanted. And the court ordered compliance in accordance with that order, the June 28 order. It seems to me that we have basically a June 28 order and a direction by the district court saying comply. Right. And in connection with compliance, because you would not provide unencrypted data with respect to this target account, it says give them the key. Well, as I note, and I think as you understand, I resist the premise that we wouldn't provide unencrypted data. We offered the government exactly that and it was rejected out of hand before even a day had passed. They don't have to accept data that has been massaged or interpreted or downloaded by your client. Well, we weren't proposing to do any massaging or interpreting. We were proposing to do what the government is content to have every other service. They wanted a pen register receiving unencrypted data and you say that could have been done technologically. Yes, and that is what was proposed. And it never was offered and never was done. Well, it was offered and refused by the government. Oh, no. It was offered that he would download the data and turn it over. They wanted to be a pen register which records the actual metadata as it's being generated. Right. And they wanted to have that data unencrypted. Right, and the question is whether the statute, specifically these two statutes... No, no, the question is whether the order, because the order was never challenged. Let's leave the statute alone. The court issued an order of June 28th and the question is whether that order was complied with. Well, I would note, first of all, that is not the theory that the government is pressing. They're saying that the statute does authorize that. That's what we have to face right here because the only issue is whether you fail to comply with the order and whether the order is legal. You didn't even challenge its legality below. And the reason that we... Well, first of all, Mr. Levinson, again, he's pro se at this point, said, I am here to object to this order. I don't think I should have to provide the keys. And the government said, well, forget about that. Now, I think that is quite reasonably construed as an objection to the order itself. He comes into court and says, I'll install the pen register. I just don't think I should have to give you the keys. Again, it's an unrepresented litigant. You didn't have to give him the keys. The order didn't say that. Right, exactly. Now, if he came up and said, I'll do it, and I need to unencrypt it as it goes into the pen register, if he could have done that, we wouldn't be here today. Well... All of a sudden, for some reason, first of all, he resisted going along. He wanted to interpose himself. And when he refused, basically the government says, okay, if we're going to get just a bold pen register, then we have to have the key. And there was an order, a search warrant to produce the key. I really do believe that the offer that you are describing that would have been sufficient is the offer that he made. I mean, I don't want to get bogged down in sort of technical details too much, but I do actually think it is true that the offer he made was not, I'm going to interpret this data, or I'm going to massage it. Not interpret. He was going to turn it over. He was going to download it himself and then turn it over. As it came into his server, just as the pen register would. Except he was going to do it on his own time calendar and he was going to charge extra amounts. He wouldn't let the monitoring... The government gets to monitor on a pen register. They get to watch calls, they get time, they can react to the calls. They're focusing on a particular target. And I think they're entitled to do that. That's what a pen register does. I am short on time and I want to reserve something for rebuttal, but the response to your point is that the government may want that information and there are ways maybe that they can get it. The question is whether... Well, they did get it with an order. The June 26 order has never been complied with and that order has never been challenged. And the question is, why isn't it a legal order that should be complied with? Right. All I will say to that, and then I'll reserve the balance, is that Judge Hilton's view is that that order didn't require the turnover of SSL keys. It doesn't. It clearly doesn't. But it requires the turnover of a pen register with unencrypted data. Yes. And how your client accomplishes that was to have your client insert himself in between the data coming off the communications lines and the pen register. And the government wanted to have it in real live time as they're entitled to under the pen register statute. Well, all I would note, and then I will reserve the balance, is that with every other service provider in the universe, they're happy to have the service provider implement it and there was no persuasive reason, or really reason at all given, for not taking the same course here to protect the privacy of those other 400,000 people. So, I'll reserve the balance for rebuttal. Mr. Peterson. Good afternoon. May it please the Court. My name is Andrew Peterson and I represent the United States. I'd like to hit two quick points, minor points, and then I'll attempt to answer from the government's perspective Judge Niemeyer's question about why the offer was rejected, or why the government did not agree with the offer that was proposed by Mr. Levinson. The two quick points. One very minor. The motion for sanctions was not ex parte. As was described at pages 120 of 120 and 121 of the appendix in the motion, a draft of that motion was provided to opposing counsel before it was filed. Opposing counsel was informed the motion would be filed if compliance wasn't made. It was filed under seal, which meant it wasn't fired electronically, but it was also provided electronically to counsel the day it was filed. Now, the judge did sign the proposed order before Lavabit had a chance to reply, but it was not an ex parte proceeding. Lavabit had fair warning of it. The second issue relates slightly to the sanctions. Which order is that? That's the final contempt order that's on appeal that was issued after Lavabit provided the 7 or 8 pages of gibberish. August 1 order? The August 5th order, Your Honor. The August 5th order was a result of a motion for sanctions, and that motion is at Joint Appendix pages 120 and 121. That's actually the order on appeal. Sorry? August 5th is actually the one that's on appeal. That's correct. That's the contempt order of finding Lavabit not in compliance and therefore imposing the fine. And the judge entered that order without giving him a chance to respond? That's correct, Your Honor. Kind of like ex parte. If it's ex parte, it's not. It's ex parte's daughter. The second issue is the standard of review, and I just wanted to cite one case. Because this came up in our brief and was responded to in the reply, we didn't get a chance to respond to Lavabit's arguments related to Yee v. Escondido, and I simply wanted to cite United States' published decision of this court from recently, 471 Federal Appendix 143, 2012 Westlaw 1354464. In that case, the panel rejected a Fourth Amendment argument being raised by a criminal defendant that was a suppression argument that was made on different grounds than were raised before the district court. And the court said, you can't raise new grounds on appeal. Those grounds have to be raised in your original motion. And that was for a criminal defendant on appeal. And I would be surprised if the court provided a more liberal standard of review to a third party defendant who is not an incarcerated defendant related to the standard of review for those types of claims for issues not raised on appeal. Judge Niemeyer framed it from the outset in the sense that we're only here because of their refusal to do what the initial request was, which was pin register, and that encryption keys became a red herring after all those things. Can you tell me, in plain language, as counsel understand, and the court might be able to understand it too, how could there be compliance with that pin register requirement without, in real time, and all the things that you wanted, the government wanted, without giving you the encryption keys? Well, and I'm no technologist, Your Honor. That's really the question, because that's what Judge Niemeyer framed there. It's only because you were noncompliant with that, and we brought the keys in because of your noncompliance. Well, I would say, I don't know what the government's response would have been if Mr. Levinson had instantly started providing dialing, routing, signaling data, the data in unencrypted format for the targeted account or accounts the day of or the day after the order, whether we would be here. Although the government certainly had a potential objection to receiving information from LavaBit without a person in the middle, that objection Flank really raised over time based on our interactions with Mr. Levinson and LavaBit, and to fill in that timeline, the order, the pin register order was served, the original order was served. Well, let me go back to the Judge Gregory's question, because he does raise a question that I raised, and maybe I didn't quite state it well, but is there technologically the possibility that the LavaBit could manage its own key such that the data were decrypted before it entered the pin register? I assume that's possible, Your Honor. I don't think based on... That's what I asked your colleague here, and he thought so too. I don't think based on the record, there is any evidence in the record one way or the other. I think opposing counsel was correct that many large service providers do this without providing encryption keys to the government. So based on that, I assume that that is technologically possible. I think the order in this case, the record seems to reflect that the order in this case to provide the government with the encryption key was a fallout of the unwillingness or the inability of the government to get a satisfactory response from LavaBit. Well, I think if Mr. Levinson had been able to implement a solution that provided unencrypted data and was handing that data over to the government, he would have been in a much different position when he approached the district court. Because the timeline here is, he receives the original order on June 28th. The government receives word that there is confusion as to whether or not it requires unencrypted data. So there is an additional order entered that same day by the same magistrate judge requiring the production of unencrypted data. Mr. Levinson informs the government he wants an attorney. From June 28th through July 9th, the government hears nothing from Mr. Levinson. That's when the government begins to reach out and talk to the court about getting an order to show cause, because now more than, or almost 10 days have passed, and nothing has happened. On the 10th, the government gets a call from an attorney who claims to represent Mr. Levinson and sets up a call on July 10th to discuss the pen register order. On that call, no promises are made about implementing a pen register, allowing the government to implement its pen register. Nothing is accomplished. And at that point, the order to show cause has already been issued and served. So the government, at this point there is confusion in terms of is there some type of order that the government can provide to LavaBit such that it will comply? So it issues a grand jury subpoena for the encryption keys. There's issues on that. At roughly that time as well, the government is informed by Mr. Levinson, and this is discussed in the government's supplement to the order to show cause in the record, that he will not attend the show cause hearing unless the government pays for his travel. So, eventually a subpoena is issued. The same day the subpoena is issued, the government is informed that counsel for Mr. Levinson has withdrawn. That's on July 11th. Two days, or June 11th, excuse me. Two days later, oh no, July 11th, I'm sorry, I have the months mixed up. Two days later is when the offer is sent via email. It was a Saturday morning that the government receives that offer. Three days before the show cause hearing, Mr. Levinson is no longer represented by counsel, and the email indicates that he needs a response prior to the hearing because if the government says okay, then he won't show up at the hearing. And the government, at that hearing, after hearing nothing for days and then one conference call where nothing was agreed to or committed to, I think, rationally thought that a hearing before the district court was the appropriate process at that point. And then at that hearing, Mr. Levinson then told the court that he would allow the government to at least install its own pen register device to attempt to get this information even though the information would be encrypted. And that's where the procedure went from there. But you switched then. Why did you work with that then? He was trying to work with you and then you said, we don't need that because we got a better weapon right here. Well, I think... That's basically what you said. He made the proposal. He offered to put on a pen register without any... The data would still be encrypted, right? He was working with you. The offer changes between the email that he sends on Saturday before the hearing and what the court asks for and he agrees to at the July 16th hearing. So what the court asks Mr. Levinson if he will do at the July 16th hearing is, will you allow the government to install its own pen register device? And the government's council says, we think that will be ineffective, but the district court says, Mr. Levinson, will you allow it? He says yes. But he doesn't want to produce the encryption key at that point. And so from there, that's the solution that's pursued with the court. Now it turns out that that solution was ineffective. But the proposal... Why was it ineffective? Because the data was encrypted. So the pen register... Again, the pen register has to identify the account that's in the order. It's not a pen register or an order that authorized the monitoring or the capture of all dialing and routing information from every LavaBit customer for all time. It needed to identify... No question, it's limited to a particular target. Correct. And because of the way SSL encryption works, the pen register could not identify all of the dialing, routing, and signaling information. I'm using pen register to include both pen register and trap and trace capabilities. Could not capture that data because some of the important dialing, routing, signaling data that it was supposed to capture was encrypted using LavaBit's SSL protocol and its SSL keys. So the machine wasn't functioning as it should or at least was not providing all the data that the government was entitled to. At no point during any time of these hearings did LavaBit make the argument that we are in compliance with the pen register order. And that's the issue why the government didn't work with LavaBit, Judge Gregory. I think we were trying to work with LavaBit. We were trying to avoid LavaBit being held in contempt. That's why this proceeding took nearly six years to complete. It was not a negotiation because the issue was LavaBit needed to be in compliance with the order. A lawful court order had been issued. The government was entitled to the data that was outlined in the order and LavaBit made no effort.  negotiation. It was not a negotiation because the issue was LavaBit needed to be in compliance and to the government that's not what it was. It was an issue of would LavaBit supply the data that was provided by the order. If LavaBit had simply implemented the software solution that it proposed in that email it would have been, or assuming it worked, it would have been in compliance with the order and the government would have had no grounds to seek sanction. But it never did that. Even by the time of the August 1st hearing, or I think it's August 1st, LavaBit is still saying, well we could do this software solution, it may work, we'd like to try it, and at that point the district judge, I think, within its discretion said, at this point no, now you need to comply you need to provide them the keys so they can put on their own device. You've had weeks to implement this solution and you haven't done it. And so I think at that point it was a bed that LavaBit had made and the district court told them to lie in it. And I think that that was a reasonable order based on what had happened in the litigation to that date. And I'd also like to point out, the government did not attempt to dupe LavaBit or waive its rights under the original June 28th pen register order. As I think is clear if you read the whole July 16th transcript what government counsel at that point is trying to do is find a way to avoid having the court find LavaBit or Mr. Levison in contempt. And the reason the government sought the search warrant is that if Mr. Levison had some objection about the specificity to or of the pen register order if that was somehow insufficient the search warrant that the government obtained which is incredibly specific and supported by a judicial finding of probable cause could leave no doubt as to what was required or authorized for the implementation of that pen register order. But LavaBit continued to not comply with the order and challenged the search warrant. The government never gave up on the pen register and it's clear from our brief that we filed in response to the motion to quash that the government still believed the pen register lawfully required LavaBit to produce that information. Was the pen register installed? A pen register was installed What date was that roughly? It was a few days after the July 16th hearing. And that was encrypted or didn't provide all the metadata that you wanted? The latter, your honor, in the sense that for some connections that were made from, based on where the pen register was installed some information that was sent to the account, trap and trace information if it was sent from an unencrypted connection was collected but there was no ability to collect user login data or any routing, dialing, or signaling data from encrypted connections to or from LavaBit. That's my understanding from discussing with that with more technical folks as to what it got. But it was the government's position that... Now did the government with the key, was the government able to go back and look at that, those data? No, your honor, because the pen register itself, if it cannot identify the proper, when the connection is encrypted, the pen register cannot identify the right encrypted communication. So if the dialing and routing information is encrypted, the pen register can't figure out that the communication is from a particular LavaBit user. So the particular target, it wouldn't pick up the target necessarily? It just wouldn't know that the particular communication is from the user and so it wouldn't record that data so you wouldn't be able to go back and use that information to decrypt it. I honestly don't know technologically even if the pen register was able to do it if an SSL key would allow that type of encryption. I don't want to misrepresent that to the court. So from June the 28th through sometime in early to mid-August, the government just lost the capability forever to get this information? Correct, and then because... In that period of time? Obviously, three days after, or approximately the day that Mr. Levison was required to provide the electronic version of the keys which would then make it usable, he shut down his service. So the government never received... It did receive... Did it explain why? Did Levison explain why he shut it down? He posted a public statement on LavaBit.com, Your Honor, which said that he, I think, and I don't know that it's in the record, I don't want to paraphrase it, but I think he did not want to be... Something about not wanting to be complicit in crimes against the American people I think is the phrasing that he used. His counsel may remember that more accurately than I do, but he indicated that he wanted to pursue a legal challenge to what he was asked to do. Did the government consider that to be an obstruction of justice? The government has not taken any action at this point related to that, Your Honor. Well, in your view, in the government's view, was there any point where LavaBit put the district court on notice, told the district court, that it challenged the authority of the district court to enter the pen trap order or, under the Stork Communications Act, to issue the search warrant? No, Your Honor. I don't think there's any... Certainly Mr. Levinson objected to producing his keys pursuant to the order that he had received at July 16th, which at that point was only the pen register order, but there was never an allegation made in any pleading to the district court challenging the lawful authority. In fact, I think the answer is the opposite. Mr. Banal, who represented Mr. Levinson at the district court level, actually said, we tend to agree that the government is entitled to the underlying data. We just object to the way that they're going about doing it. But I don't think that LavaBit ever challenged the authority of the government to obtain this data, the underlying dialing, routing, and signaling data under the pen register statute, or made a specific challenge to the warrant part of the Stored Communications Act. The Stored Communications Act argument made before the district court related to the standard for 2703D orders, which is a separate statutory provision. It's part of the same statute, but it relates to court orders, which cannot be used to get the content of communications, not warrants under the Stored Communications Act, which are issued under procedures similar to Rule 41 of the Federal Rules of Criminal Procedure. Because we've talked about so many, as you, I think, very technical-type new areas. We've got some very important issues about Fourth Amendment protections and government's right to get information. Wouldn't it be appropriate in this case, at least, to be remanded to the district court to give a fair hearing about why this is, in fact, was or was not contemptuous activity or conduct? Because, for example, did you tell the court that he gave you three days before that hearing, even though over the weekend, a proposal? Did you ever say, court, I want you to order him to do what he said he was going to do in the email? We did not request that specific order. That would have been exactly what you should have done, wouldn't it? Well, the order, what we simply requested, Your Honor, was that the court order Lavabit to comply with the lawful orders that it had received. But that's what he was trying to do. And you admitted in your argument, you said if he had done that, that had worked, that would have done it. There was absolutely nothing, from the time that he received that order on June 28th, that prevented him from doing that. It was not the government that was holding his hands and saying, don't recode your system to give us this information. At any time, he could have done that. And it was his choice not to. And in terms of remanding this case for additional proceedings, honestly, because the only thing, I don't think there's any question... Not additional, but just proceedings. Well, I don't think there's any question that refusing to implement or follow what is a very clear court order is contemptuous conduct. I don't think there's additional fact-finding needed for that. It's not clear in this case, though. It's very technical. Even you can't even represent whether the solution would have been appropriate. He's a pro se, and we do try to give pro se litigants a fair opportunity to sort of, people say, but verbally bend over backwards if we can to give a fair understanding. Wait, let me finish. Listen, I have a question for you. Do like you do your other ISP. You know, you don't do that, you don't get their keys. It seems like they're working together, but then you have a contempt order that's signed on your motion without any hearing from the other side. Well, I disagree, Your Honor, in the sense that he was given that opportunity. He wasn't found in contempt on July 16th when he was pro se. He hired an attorney. He filed a brief challenging orders issued by the district court, some of them. He had a hearing. He had a hearing.   He had a hearing. And I think at that point, the district court rejected that solution, which I think reasonably... Why did the district court reject it? Well, I think at that point, and candidly, I think any trust between the government and Mr. Levison at that point for him to lawfully comply with providing that data had broken down. My timer will go off. I can add additional... Never mind. Go ahead. Your time is up. My time is up. If the panel has any other questions... Thank you, Mr. Peterson. Mr. Simon. Thank you very much. If there is one appendix citation that I could just burn into the mind of everyone here, it would be pages 43 and 44, because I think it goes to the exact issues that we were discussing earlier, Judge Niemeyer, where what Judge Hilton says is, as I understand it, my initial order ordered nothing but that the pen register be put in place. And Mr. Levison says, yes, that's correct. That's fine with me. And the government says, well, we also think they required a bit more than that, adopting the theory that was proposed earlier. The court said, well, that could be, but, quote, I don't know that I need to reach that, because now there's this search warrant, right? And the government says, correct. To avoid litigating this issue, we asked the court to enter the seizure warrant. At that point, the court had told us that my initial order doesn't require you to provide the encryption keys, and moreover, to avoid litigating this issue... I don't think that... They're not talking about keys. They're talking about whether it's complied with, and the court never relieved Lava Bid of any aspect of the court's order, the June order. Correct. And the June order, the court basically was short-circuiting and said, well, if you guys can't comply with that, I'm going to do it under the warrant or the search and seizure order. Right. Well, and what Mr. Levison said, and this is page 42, about 30 seconds earlier in that same hearing, is, I've always agreed to the installation of the pen register. I've only ever objected to turning over the SSL keys. Now, it's true that the government, and I take the sort of main thrust of all this, and I really... That's disingenuous, that statement. I do understand that. I do actually truly appreciate the thrust of the point that you are making, which is, okay, the pen register's installed. How are they supposed to get the data? And what we are not saying is, either they have no way to get the data. There are ways. There are ways to get from third parties information that is relevant to a criminal investigation. Usually, the way you do that is a subpoena. This is not a new problem. And a subpoena gives you procedural protections. You can go to the district court and say, they have ordered me to turn over information. It would be very damaging for me. What about an alternative? What about a compromise? And, of course, the district courts get a lot of discretion in modifying and quashing, you know, the orders that come out of a grand jury subpoena. So we are not proposing, absolutely not proposing, that the government has no options to get information it needs from innocent third parties. It's just that the Pen Register Act and the Stored Communications Act don't entitle them to do it automatically in every case with no protections under that act. We're not challenging the act, and you didn't raise it below. We're looking at an order says to produce unencrypted data. And the question is, that has never been challenged. And the question is, the offer that you just read was not an offer to produce unencrypted data. And in this case it is particularly meaningful because the encryption blinds the data from where it came from, what servers it went through. And that's exactly the type of metadata that the government needed to conduct its investigation. I agree with that. Now, and the important thing is that the government has options in that situation. They can... Well, they elected to get this order, and they got it. And then they elected to get a warrant, and they got it. Right. And both of them, neither were complied with. Well... And it was a lot of give and take. But the problem is, the summer's going by and the investigation is a hot investigation. The target could be hearing about this and move on to other sites and totally frustrate a legitimate effort of the federal government. I understand that. And it was with that very understanding that Mr. Levison made an offer, which was serious, that this could have been short circuit. The government had written back on July 13th and said, OK, sounds good, but you got to make sure, you know, it needs to be real time, it needs to be fast, and, you know, maybe we'll give you $2,500 instead of $3,000. Then this could have all been over and done with before the end of July. What they elected to do instead was say, I mean, apparently, essentially, out of, you know, they've sort of grown to dislike the litigant, well, forget about it. We don't trust you anymore. And so we're going to go and we're going to try to sort of advance this. He didn't invoke much trust, did he, in the way he conducted himself? I mean, he remained silent in response to the order for a fairly long time. I mean, they want the data immediately. And how long was it? Ten days? Eight days? Well, what he was doing was consulting with counsel, of course, and I don't think that that's an act of malice. It's really just, I mean, this is a businessman who has customers, and who those customers expect him to comply with the law, of course, but he didn't need time to speak to a lawyer. I mean, the government's a repeat player. It's a routine for them. But most small businessmen have not had requests like this before. And so to say, well, I'd like to talk to a lawyer, a lot of these representations are coming orally from FBI agents. Nothing's been reduced to writing. I'm not a lawyer. I run a business. Let me talk to counsel, at least. That's not an act of malice toward the government. And then when it became clear what they wanted, he said, okay, I've got a compromise solution. I will modify my own system to log the data. How could it have been that unclear? The very first order on June 28th said unencrypted data. Well, sure, although there was actually some, there were some things that happened. Well, sure, that's the order, the plain language of the order, and then they're sitting there six weeks later, and he still hasn't complied. Well, six weeks later takes us to the August hearing. That's several weeks after he offered to give them the data, and... Every offer, you know, you keep talking about these offers, and every time you go to an offer, there's a problem with the offers. I mean, one of his main devices was, oh, put them on there. And, of course, all it does is spit out unencrypted data. Not only that, it doesn't even pick the right data because they don't know the source. They want the data only from a target, to and from the target, or involving the target. Right, and again, if you, I mean, when I say offer, the only thing to which I'm ever referring is the text on Appendix 83 where he says, I will modify the systems to log all of the information to which you are entitled, and I will turn it over to you. This will protect the privacy of the other customers. Now, that is one way that the government can get this information. There are other ways, like grand jury subpoena. Except they're entitled by the statute to get it as a pen register and not as downloading by him. In other words, if he records the data and then turns it over, he is now an intermediary. It's not a direct observation by the government. That's true, of course, but the government tells us in its brief, and it is true, that they are typically happy to have service providers implement this using their own software. Look, the fact that they a hundred times may have worked out something with something doesn't mean that your client can't comply with this order. That's true, although, with respect, I would also say that it doesn't mean that this order is something that they are entitled to get under the pen register statute. Nobody objected to it. Well, he did come to district court, and I feel like I've made this point. I know, but the order almost quotes verbatim the statute as it goes through and makes these points. I'm talking about the June order now. Even today, I have not heard anybody say that that order is illegal, and I don't know what case could be made. It doesn't say turn over the key. What it says, provide the data in an unencrypted form. The key became an issue later when the without having the key. Even when they asked for the key, they only wanted to use it and were only authorized to use it in connection with a particular target. Of course, those representations about the record, I agree with them. However, what had happened was that, of course, once Mr. Levison understood, you want the unencrypted data, I'll offer you the unencrypted data. They said no, and so that's the point at which the SSL keys really became the live issue. When the offer to give them exactly what they were entitled to, with no loss of privacy for the other hundreds of thousands of customers, when that was refused, then the government said, the government didn't say, you know, let's try to work something out, and the government didn't even pursue the grand jury subpoena, which is the usual way you get information from an innocent third party that isn't the fruit, instrument, or evidence of a crime. The government said is we don't want to have to even deal with the procedural protections of the grand jury. We want to get this information. We're entitled to it in every case. Every time we install a pen register, we get the SSL keys if we decide that we don't trust you. That is what the government went and said. There were other options for them to get this information. They didn't even have to involve trusting the company if the government doesn't trust them anymore. What they can't do is they can't say that these statutes and that the Fourth Amendment, which doesn't authorize any of this, gives it to us in every single case if we decide that we don't trust you. I see that I'm over my time. If there are no further questions from the panel, I'll take my seat. Thank you. We'll adjourn for the day.
judges: Paul V. Niemeyer, Roger L. Gregory, G. Steven Agee